PER CURIAM.
In 2015, the Texas Court of Criminal Appeals held that petitioner, Bobby James Moore, did not have intellectual disability and consequently was eligible for the death penalty. Ex parte Moore , 470 S.W.3d 481, 527-528 ( Ex parte Moore I ). We previously considered the lawfulness of that determination, vacated the appeals court's decision, and remanded the case for further consideration of the issue. Moore v. Texas , 581 U.S. ----, ----, 137 S.Ct. 1039, 1053, 197 L.Ed.2d 416 (2017). The appeals court subsequently reconsidered the matter but reached the same conclusion. Ex parte Moore , 548 S.W.3d 552, 573 (Tex. Crim. App. 2018) ( Ex parte Moore II ). We again review its decision, and we reverse its determination.
I
When we first heard this case, in Moore , we noted that the state trial court (a state habeas court) "received affidavits and heard testimony from Moore's family members, former counsel, and a number of court-appointed mental-health experts." 581 U.S., at ----, 137 S.Ct., at 1045. We described the evidence as "reveal[ing]" the following:
"Moore had significant mental and social difficulties beginning at an early age. At 13, Moore lacked basic understanding of the days of the week, the months of the *668 year, and the seasons; he could scarcely tell time or comprehend the standards of measure or the basic principle that subtraction is the reverse of addition. At school, because of his limited ability to read and write, Moore could not keep up with lessons. Often, he was separated from the rest of the class and told to draw pictures. Moore's father, teachers, and peers called him 'stupid' for his slow reading and speech. After failing every subject in the ninth grade, Moore dropped out of high school. Cast out of his home, he survived on the streets, eating from trash cans, even after two bouts of food poisoning." Ibid . (citations omitted).
On the basis of this and other evidence, the trial court found that Moore had intellectual disability and thus was ineligible for the death penalty under Atkins v. Virginia , 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). App. to Pet. for Cert. 310a-311a. The Texas Court of Criminal Appeals reversed that determination, Ex parte Moore I , 470 S.W.3d 481, and we reviewed its decision, Moore , 581 U.S. ----, 137 S.Ct. 1039, 197 L.Ed.2d 416.
At the outset of our opinion, we recognized as valid the three underlying legal criteria that both the trial court and appeals court had applied. Id ., at ---- - ----, 137 S.Ct., at 1045-1046 (citing American Association on Intellectual and Developmental Disabilities, Intellectual Disability: Definition, Classification, and Systems of Supports (11th ed. 2010) (AAIDD-11); American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (DSM-5)). To make a finding of intellectual disability, a court must see: (1) deficits in intellectual functioning-primarily a test-related criterion, see DSM-5, at 37; (2) adaptive deficits, "assessed using both clinical evaluation and individualized ... measures," ibid .; and (3) the onset of these deficits while the defendant was still a minor, id ., at 38. With respect to the first criterion, we wrote that Moore's intellectual testing indicated his was a borderline case, but that he had demonstrated sufficient intellectual-functioning deficits to require consideration of the second criterion-adaptive functioning. Moore , 581 U.S., at ---- - ----, 137 S.Ct., at 1048-1050. With respect to the third criterion, we found general agreement that any onset took place when Moore was a minor. Id ., at ----, n. 3, 137 S.Ct., at 1045, n. 3.
But there was significant disagreement between the state courts about whether Moore had the adaptive deficits needed for intellectual disability. "In determining the significance of adaptive deficits, clinicians look to whether an individual's adaptive performance falls two or more standard deviations below the mean in any of the three adaptive skill sets (conceptual, social, and practical)." Id ., at ----, 137 S.Ct., at 1046 (citing AAIDD-11, at 43). Based on the evidence before it, the trial court found that "Moore's performance fell roughly two standard deviations below the mean in all three skill categories." 581 U.S., at ----, 137 S.Ct., at 1046 ; see App. to Pet. for Cert. 309a. Reversing that decision, the appeals court held that Moore had "not proven by a preponderance of the evidence" that he possessed the requisite adaptive deficits, and thus was eligible for the death penalty. Ex parte Moore I , 470 S.W.3d at 520. We disagreed with the appeals court's adaptive-functioning analysis, however, and identified at least five errors.
First, the Texas Court of Criminal Appeals "overemphasized Moore's perceived adaptive strengths." Moore , 581 U.S., at ----, 137 S.Ct., at 1050. "But the medical community," we said, "focuses the *669 adaptive-functioning inquiry on adaptive deficits ." Ibid .
Second, the appeals court "stressed Moore's improved behavior in prison." Id ., at ----, 137 S.Ct., at 1050. But "[c]linicians ... caution against reliance on adaptive strengths developed 'in a controlled setting,' as a prison surely is." Ibid . (quoting DSM-5, at 38).
Third, the appeals court "concluded that Moore's record of academic failure, ... childhood abuse[,] and suffering ... detracted from a determination that his intellectual and adaptive deficits were related." 581 U.S., at ----, 137 S.Ct., at 1051. But "in the medical community," those "traumatic experiences" are considered " 'risk factors ' for intellectual disability." Ibid . (quoting AAIDD-11, at 59-60).
Fourth, the Texas Court of Criminal Appeals required "Moore to show that his adaptive deficits were not related to 'a personality disorder.' " 581 U.S., at ----, 137 S.Ct., at 1051 (quoting Ex parte Moore I , 470 S.W.3d at 488 ). But clinicians recognize that the "existence of a personality disorder or mental-health issue ... is 'not evidence that a person does not also have intellectual disability.' " 581 U.S., at ----, 137 S.Ct., at 1051 (quoting Brief for American Psychological Association et al. as Amici Curiae in Moore v. Texas , O.T. 2016, No. 15797, p. 19.
Fifth, the appeals court directed state courts, when examining adaptive deficits, to rely upon certain factors set forth in a Texas case called Ex parte Briseno , 135 S.W.3d 1 (Tex. Crim. App. 2004). Ex parte Moore I , 470 S.W.3d at 486, 489. The Briseno factors were: whether "those who knew the person best during the developmental stage" thought of him as "mentally retarded"; whether he could "formulat[e] plans" and "car[ry] them through"; whether his conduct showed "leadership"; whether he showed a "rational and appropriate" "response to external stimuli"; whether he could answer questions "coherently" and "rationally"; whether he could "hide facts or lie effectively"; and whether the commission of his offense required "forethought, planning, and complex execution of purpose." 135 S.W.3d at 8-9.
We criticized the use of these factors both because they had no grounding in prevailing medical practice, and because they invited "lay perceptions of intellectual disability" and "lay stereotypes" to guide assessment of intellectual disability. Moore , 581 U.S., at ----, 137 S.Ct., at 1051. Emphasizing the Briseno factors over clinical factors, we said, " 'creat[es] an unacceptable risk that persons with intellectual disability will be executed.' " 581 U.S., at ----, 137 S.Ct., at 1051 (quoting Hall v. Florida , 572 U.S. 701, 704, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014) ). While our decisions in " Atkins and Hall left to the States 'the task of developing appropriate ways to enforce' the restriction on executing the intellectually disabled," 581 U.S., at ----, 137 S.Ct., at 1048 (quoting Hall , 572 U.S. at 719, 134 S.Ct. 1986 ), a court's intellectual disability determination "must be 'informed by the medical community's diagnostic framework,' " 581 U.S., at ----, 137 S.Ct., at 1048 (quoting Hall , 572 U.S. at 721, 134 S.Ct. 1986 ).
Three Members of this Court dissented from the majority's treatment of Moore's intellectual functioning and with aspects of its adaptive-functioning analysis, but all agreed about the impropriety of the Briseno factors. As THE CHIEF JUSTICE wrote in his dissenting opinion, the Briseno factors were "an unacceptable method of enforcing the guarantee of Atkins " and the Texas Court of Criminal Appeals "therefore erred in using them to analyze adaptive deficits."
*670 Moore , 581 U.S., at ----, 137 S.Ct., at 1053 (opinion of ROBERTS, C.J.)
For the reasons we have described, the Court set aside the judgment of the appeals court and remanded the case "for further proceedings not inconsistent with this opinion." Id ., at ----, 137 S.Ct., at 1053.
II
On remand the Texas Court of Criminal Appeals reconsidered the appeal and reached the same basic conclusion, namely, that Moore had not demonstrated intellectual disability. Ex parte Moore II , 548 S.W.3d at 555. The court again noted the three basic criteria: intellectual-functioning deficits, adaptive deficits, and early onset. Id ., at 560-562. But this time it focused almost exclusively on the second criterion, adaptive deficits. The court said that, in doing so, it would "abandon reliance on the Briseno evidentiary factors." Id ., at 560. It would instead use " 'current medical diagnostic standards' " set forth in the American Psychiatric Association's DSM-5. Id ., at 559-560. In applying those standards to the trial court record, it found the State's expert witness, Dr. Kristi Compton, " 'far more credible and reliable' " than the other experts considered by the trial court. Id ., at 562. (As in our last opinion, we neither second nor second-guess that judgment.) And, as we have said, it reached the same conclusion it had before.
Moore has now filed a petition for certiorari in which he argues that the trial court record demonstrates his intellectual disability. He asks us to reverse the appeals court's contrary holding. Pet. for Cert. 2. The prosecutor, the district attorney of Harris County, "agrees with the petitioner that he is intellectually disabled and cannot be executed." Brief in Opposition 9. The American Psychological Association (APA), American Bar Association (ABA), and various individuals have also filed amicus curiae briefs supporting the position of Moore and the prosecutor. Brief for APA et al. as Amici Curiae ; Brief for ABA as Amicus Curiae ; Brief for Donald B. Ayer et al. as Amici Curiae . The Attorney General of Texas, however, has filed a motion for leave to intervene, and asks us to deny Moore's petition. Motion for Leave to Intervene as a Respondent.
III
After reviewing the trial court record and the court of appeals' opinion, we agree with Moore that the appeals court's determination is inconsistent with our opinion in Moore . We have found in its opinion too many instances in which, with small variations, it repeats the analysis we previously found wanting, and these same parts are critical to its ultimate conclusion.
For one thing, the court of appeals again relied less upon the adaptive deficits to which the trial court had referred than upon Moore's apparent adaptive strengths . See Moore , 581 U.S., at ----, 137 S.Ct., at 1050 (criticizing the appeals court's "overemphas[is]" upon Moore's "perceived adaptive strengths"); supra , at 668 - 669. The appeals court's discussion of Moore's "[c]ommunication [s]kills" does not discuss the evidence relied upon by the trial court. Ex parte Moore II , 548 S.W.3d at 563-565. That evidence includes the young Moore's inability to understand and answer family members, even a failure on occasion to respond to his own name. App. to Pet. for Cert. 289a-290a. Its review of Moore's "[r]eading and [w]riting" refers to deficits only in observing that "in prison, [Moore] progressed from being illiterate to being able to write at a seventh-grade level." Ex parte Moore II , 548 S.W.3d at 565. But the trial court heard, among other things, evidence that in school Moore was made to draw pictures when other children were *671 reading, and that by sixth grade Moore struggled to read at a second-grade level. App. to Pet. for Cert. 290a, 295a.
Instead, the appeals court emphasized Moore's capacity to communicate, read, and write based in part on pro se papers Moore filed in court. Ex parte Moore II , 548 S.W.3d at 565-566. That evidence is relevant, but it lacks convincing strength without a determination about whether Moore wrote the papers on his own, a finding that the court of appeals declined to make. Rather, the court dismissed the possibility of outside help: Even if other inmates "composed" these papers, it said, Moore's "ability to copy such documents by hand" was "within the realm of only a few intellectually disabled people." Id ., at 565. Similarly, the court of appeals stressed Moore's "coherent" testimony in various proceedings, but acknowledged that Moore had "a lawyer to coach him" in all but one. Id ., at 564, and n. 95. As for that pro se hearing, the court observed that Moore read letters into the record "without any apparent difficulty." Ibid .
For another thing, the court of appeals relied heavily upon adaptive improvements made in prison. See Moore , 581 U.S., at ----, 137 S.Ct., at 1050 ("caution[ing] against reliance on adaptive strengths developed" in "prison"); supra , at 668. It concluded that Moore has command of elementary math, but its examples concern trips to the prison commissary, commissary purchases, and the like. Ex parte Moore II , 548 S.W.3d at 566-569. It determined that Moore had shown leadership ability in prison by refusing, on occasion, "to mop up some spilled oatmeal," shave, get a haircut, or sit down. Id ., at 570-571, and n. 149. And as we have said, it stressed correspondence written in prison. Id ., at 565. The length and detail of the court's discussion on these points is difficult to square with our caution against relying on prison-based development.
Further, the court of appeals concluded that Moore failed to show that the "cause of [his] deficient social behavior was related to any deficits in general mental abilities" rather than "emotional problems." Id ., at 570. But in our last review, we said that the court of appeals had "departed from clinical practice" when it required Moore to prove that his "problems in kindergarten" stemmed from his intellectual disability, rather than " 'emotional problems.' " Moore , 581 U.S., at ----, 137 S.Ct., at 1051 (quoting Ex parte Moore I , 470 S.W.3d at 488, 526 ). And we pointed to an amicus brief in which the APA explained that a personality disorder or mental-health issue is "not evidence that a person does not also have intellectual disability." 581 U.S., at ----, 137 S.Ct., at 1051 (quoting Brief for APA et al. as Amici Curiae in No. 15-797, at 19).
Finally, despite the court of appeals' statement that it would "abandon reliance on the Briseno evidentiary factors," Ex parte MooreII , 548 S.W.3d at 560, it seems to have used many of those factors in reaching its conclusion. See supra , at 669 - 670 (detailing those factors). Thus, Briseno asked whether the "offense require[d] forethought, planning, and complex execution of purpose." 135 S.W.3d at 9. The court of appeals wrote that Moore's crime required "a level of planning and forethought." Ex parte Moore II , 548 S.W.3d at 572, 603 (observing that Moore "w[ore] a wig, conceal[ed] the weapon, and fle[d]" after the crime).
Briseno asked whether the defendant could "respond coherently, rationally, and on point to oral and written questions." 135 S.W.3d at 8. The court of appeals found that Moore "responded rationally and coherently to questions." Ex parte Moore II , 548 S.W.3d at 564.
*672 And Briseno asked whether the defendant's "conduct show[s] leadership or ... that he is led around by others." 135 S.W.3d at 8. The court of appeals wrote that Moore's "refus[al] to mop up some spilled oatmeal" (and other such behavior) showed that he "influences others and stands up to authority." Ex parte Moore II , 548 S.W.3d at 570-571.
Of course, clinicians also ask questions to which the court of appeals' statements might be relevant. See AAIDD-11, at 44 (noting that how a person "follows rules" and "obeys laws" can bear on assessment of her social skills). But the similarity of language and content between Briseno 's factors and the court of appeals' statements suggests that Briseno continues to "pervasively infec[t] the [the appeals courts'] analysis." Moore , 581 U.S., at ----, 137 S.Ct., at 1053.
To be sure, the court of appeals opinion is not identical to the opinion we considered in Moore . There are sentences here and there suggesting other modes of analysis consistent with what we said. But there are also sentences here and there suggesting reliance upon what we earlier called "lay stereotypes of the intellectually disabled." Id ., at ----, 137 S.Ct., at 1052. Compare Ex parte Moore II , 548 S.W.3d at 570-571 (finding evidence that Moore "had a girlfriend" and a job as tending to show he lacks intellectual disability), with AAIDD-11, at 151 (criticizing the "incorrect stereotypes" that persons with intellectual disability "never have friends, jobs, spouses, or children"), and Brief for APA et al. as Amici Curiae 8 ("[I]t is estimated that between nine and forty percent of persons with intellectual disability have some form of paid employment").
We conclude that the appeals court's opinion, when taken as a whole and when read in the light both of our prior opinion and the trial court record, rests upon analysis too much of which too closely resembles what we previously found improper. And extricating that analysis from the opinion leaves too little that might warrant reaching a different conclusion than did the trial court. We consequently agree with Moore and the prosecutor that, on the basis of the trial court record, Moore has shown he is a person with intellectual disability.
* * *
The petition for certiorari is granted. The Attorney General of Texas' motion to intervene is denied; we have considered that filing as an amicus brief. The judgment of the Texas Court of Criminal Appeals is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.
It is so ordered.