**[Cite as *State v. Wesson*, 2026-Ohio-1141.]**

| | | | |
|---|---|---|---|
| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

| | |
|---|---|
| STATE OF OHIO | C.A. No. 31448 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| HERSIE R. WESSON, JR. | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR-2008-03-0710 |

DECISION AND JOURNAL ENTRY

Dated: March 31, 2026

SUTTON, Judge.

{¶1}     Defendant-Appellant, Hersie Wesson, Jr., appeals from the judgment of the Summit County Court of Common Pleas.  This Court reverses.

I.

{¶2}     In 2013, the Ohio Supreme Court upheld Mr. Wesson's capital sentence.  *State v. Wesson*, 2013-Ohio-4575.  He sought post-conviction relief, but this Court affirmed the denial of his petition.  *See State v. Wesson*, 2012-Ohio-4495 (9th Dist.).  After unsuccessfully trying to appeal our decision and reopen his direct appeal to the Ohio Supreme Court, Mr. Wesson filed a habeas petition in the federal district court.

{¶3}     While his habeas petition was pending, Mr. Wesson filed a second petition for post-conviction relief in state court.  His second petition included arguments that he was intellectually disabled, his former attorneys were ineffective for not raising that disability, and, given his

disability, a death sentence was unconstitutional. Mr. Wesson secured a stay of his federal case until his second petition could be resolved in state court.

{¶4} Mr. Wesson presented affidavit evidence in support of his second petition, but the trial court denied it without holding a hearing. The trial court determined that Mr. Wesson had not satisfied his burden under R.C. 2953.23(A)(1) to justify its review of an untimely, successive petition. This Court affirmed the trial court's judgment on appeal, and the Ohio Supreme Court declined review. *See State v. Wesson*, 2018-Ohio-834 (9th Dist.); *State v. Wesson*, 2018-Ohio-2639. Thereafter, the federal district court reactivated Mr. Wesson's case.

{¶5} Mr. Wesson filed an amended habeas petition and sought an evidentiary hearing. The district court reviewed his written materials and found he had presented "a credible claim that he is intellectually disabled and therefore exempt from execution." *Wesson v. Jenkins*, 2020 WL 1066531, *58 (N.E. Ohio Mar. 5, 2020). Nevertheless, based strictly on the record before it, the district court was unable to determine whether Mr. Wesson had procedurally defaulted on his claim or whether he had received ineffective assistance of counsel such that the procedural default would be excused. *Id.* at *63. The district court found that Mr. Wesson was entitled to an opportunity to present evidence in support of his claim that his trial counsel and first post-conviction counsel were ineffective for failing to argue his intellectual disability. *Id.* Consequently, it reserved judgment on that aspect of his petition pending an evidentiary hearing. *Id.* at *67.

{¶6} Following the district court's decision, the parties jointly moved the federal court to stay Mr. Wesson's case. They asked the district court to remand the matter to state court for an evidentiary hearing. Further, the State agreed not to oppose any Civ.R. 60(B) motion Mr. Wesson filed in state court to seek relief related to his intellectual disability claim. The district court approved the joint request, stayed Mr. Wesson's federal case, and ordered a remand.

{¶7} Mr. Wesson filed a Civ.R. 60(B) motion in state court seeking relief from the death penalty due to his intellectual disability. The trial court ultimately held a two-day evidentiary hearing on his motion wherein it heard expert and lay testimony. The parties then submitted post-hearing briefs. After a delay of almost two years, the trial court issued a decision denying Mr. Wesson's motion.

{¶8} Mr. Wesson now appeals from the trial court's judgment and raises two assignments of error for review. For ease of analysis, we reorder the assignments of error.

II.

**ASSIGNMENT OF ERROR II**

**THE TRIAL COURT'S OPINION RUNS AFOUL OF THE CONSTITUTION'S CRUEL AND UNUSUAL PUNISHMENT CLAUSE, AND THE COURT VIOLATED [MR.] WESSON'S CONSTITUTIONAL RIGHT TO DUE PROCESS WHEN IT ARBITRARILY AND ERRONEOUSLY REFUSED TO CONSIDER AN ENTIRE CATEGORY OF EVIDENCE RELEVANT TO DETERMINING INTELLECTUAL DISABILITY.**

{¶9} In his second assignment of error, Mr. Wesson argues the trial court misapplied the test for intellectual disability in several respects and, in doing so, erroneously refused to consider certain evidence. Upon review, we agree.

{¶10} "[T]he Eighth and Fourteenth Amendments to the Constitution forbid the execution of persons with intellectual disability." *Hall v. Florida*, 572 U.S. 701, 704 (2014), citing *Atkins v. Virginia*, 536 U.S. 304 (2002). "The legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework." *Hall v. Florida*, 572 U.S. 701, 721 (2014). When examining the issue of intellectual disability, the United States Supreme Court and the Ohio Supreme Court have routinely cited and relied upon manuals produced by the American Psychiatric Association ("APA") and the American

Association of Intellectual and Developmental Disabilities ("AAIDD"). *See, e.g., Moore v. Texas* ("*Moore II*"), 586 U.S. 133, 135 (2019); *State v. Ford*, 2019-Ohio-4539, ¶ 46. Ohio's current test for intellectual disability derives from the 5th edition of the APA's Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") and the 11th edition of the AAIDD's clinical manual ("AAIDD-11"). *See Ford* at ¶ 46.

{¶11} In capital cases,

> a court determining whether a defendant is intellectually disabled must consider three core elements: (1) intellectual-functioning deficits (indicated by an IQ score approximately two standard deviations below the mean—i.e., a score of roughly 70 or lower when adjusted for the standard error of measurement), (2) significant adaptive deficits in any of the three adaptive-skill sets (conceptual, social, and practical), and (3) the onset of these deficits while the defendant was a minor.

*Id.* at ¶ 100. A defendant bears the burden of establishing that he is intellectually disabled by a preponderance of the evidence. *State v. Lott*, 2002-Ohio-6625, ¶ 21, *overruled on other grounds*, *Ford* at ¶ 97. When reviewing a trial court's postconviction decision to grant or deny an *Atkins* claim, appellate courts generally apply the abuse of discretion standard. *State v. White*, 2008-Ohio-1623, ¶ 44-46. Yet the question of "[w]hether the trial court applied the proper law is a legal decision which this Court reviews de novo." *Pelmar USA, L.L.C. v. Mach. Exchange Corp.*, 2012-Ohio-3787, ¶ 24 (9th Dist.).

### Overview of the Core Elements of Intellectual Disability

{¶12} We begin with a brief overview of the three core elements a court must consider in reviewing a claim of intellectual disability. *See Ford* at ¶ 100.

1. Intellectual Functioning Deficits

{¶13} Intellectual functions include "reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience . . . ." DSM-5, Section II, Diagnostic Criteria, Subsection A. Deficits in intellectual functioning are "primarily a test-related

criterion . . . ." *Moore II*, 586 U.S. at 135. They are generally "indicated by an IQ score approximately two standard deviations below the mean – i.e., a score of roughly 70 or lower when adjusted for the standard error of measurement . . . ." *Ford* at ¶ 100. *Accord Moore v. Texas* ("*Moore I*"), 581 U.S. 1, 7 (2017), quoting AAIDD-11.

{¶14} Importantly, "IQ test scores should be read not as a single fixed number but as a range." *Hall*, 572 U.S. at 712. That is because "[e]ach IQ test has a 'standard error of measurement,' often referred to by the abbreviation 'SEM.'" (Internal citation omitted.) *Id.* at 713. The SEM generally results in a five-point increase or reduction in an individual's score. *Id.* "A score of 71, for instance, is generally considered to reflect a range between 66 and 76 with 95% confidence . . . ." *Id.* Trial courts must "consider the SEM when evaluating a defendant's IQ scores." *Ford* at ¶ 81. "[W]here an individual's IQ score, adjusted for the [SEM], falls within the clinically established range for intellectual-functioning deficits[,]" a court must "continue the inquiry and consider other evidence of intellectual disability . . . ." *Moore I* at 15. "Even when a person has taken multiple tests, each separate score must be assessed using the SEM . . . ." *Hall* at 714. A defendant's "higher performance on other IQ tests [does] not allow the trial court to ignore an IQ score that falls at or below 70." *Ford* at ¶ 85.

{¶15} An IQ score also may be impacted by the Flynn Effect, which is distinct from the SEM. *Ford* at ¶ 87. "The Flynn Effect . . . is a 'generally recognized phenomenon' in which the average IQ scores produced by any given IQ test tend to rise over time, often by approximately three points per ten years from the date the IQ test is initially standardized." (Cleaned up.) *Id.*, quoting *Black v. Carpenter*, 866 F.3d 734, 738, fn. 1 (6th Cir. 2017). Thus, if an individual scored a 73 on an IQ test administered in 2020 but published in 2010, application of the Flynn Effect would result in an adjusted score of 70, not including any reduction due to the SEM. The Ohio

Supreme Court has not mandated application of the Flynn Effect. *See Ford* at ¶ 91. Even so, it has recognized that the AAIDD recommends application of the Flynn Effect when tests with aging norms have been used as a part of an intellectual disability diagnosis. *Id.* at ¶ 90. The Supreme Court has held that, when a defendant argues and presents evidence on the Flynn Effect, the trial court must discuss and consider that evidence, exercise its discretion, and decide whether the Flynn Effect should apply. *Id.* at ¶ 92.

2. Significant Adaptive Deficits

{¶16} Adaptive functioning refers to an individual's ability "to meet developmental and sociocultural standards for personal independence and social responsibility." DSM-5, Section II, Diagnostic Criteria, Subsection B. *See also Hall*, 572 U.S. at 710 (describing a deficit in adaptive functioning as "the inability to learn basic skills and adjust behavior to changing circumstances"). Adaptive skills are sorted into three domains, aka, skill sets: conceptual, social, and practical. *Moore I*, 581 U.S. at 8, citing AAIDD-11. To satisfy the adaptive deficits prong, a defendant must show that he suffers from "significant deficits in *any* of the three adaptive-skill sets." (Emphasis in original.) *Ford* at ¶ 96.

{¶17} When assessing adaptive functioning, courts should caution against making certain analytical errors. First, courts should be mindful to focus on adaptive *deficits* rather than overemphasizing an individual's perceived adaptive *strengths*. *See Moore I* at 15; *Moore II*, 586 U.S. at 136. Second, courts should guard against relying on perceived strengths achieved in controlled settings like prison rather than real-world environments. *See Moore I* at 16; *Moore II* at 136. Third, courts should caution against readily attributing adaptive deficits to traumatic experiences or co-existing mental health conditions rather than intellectual disability as the former is a risk factor for intellectual disability and the latter does not preclude a finding of intellectual

disability.  *See Moore I* at 17; *Moore II* at 136-137.  Finally, courts should avoid relying on "'lay perceptions of intellectual disability'" and "'lay stereotypes'" that "[have] no grounding in prevailing medical practice."  *Moore II* at 137, quoting *Moore I* at 18.

3. Onset of Deficits

**{¶18}**  The onset element requires a defendant to prove that his intellectual and adaptive deficits manifested "during the developmental period."  DSM-5, Section II, Diagnostic Criteria, Subsection C.  The Ohio Supreme Court has interpreted this element to mean that deficits must onset "while the defendant was a minor."  *Ford*, 2019-Ohio-4539, at ¶ 100.

**Evidence Presented to the Trial Court**

**{¶19}**  The parties presented evidence to the trial court in the form of expert testimony, lay testimony, and exhibits.  To provide context for our review and analysis of the trial court's application of the law, we begin by outlining the evidence presented to the trial court.

Dr. Jeffrey Smalldon

**{¶20}**  Dr. Smalldon, a board-certified clinical and forensic psychologist, testified as a mitigation expert at Mr. Wesson's trial in 2008.  He met with Mr. Wesson three times for a total of about 15 hours.  Dr. Smalldon was never asked to complete an expert report, but he shared his findings at trial.

**{¶21}**  Dr. Smalldon testified that both of Mr. Wesson's parents were alcoholics and his mother drank while pregnant.  He testified that "prenatal exposure to alcohol is the single greatest contributor to [intellectual disability]."[1]  He found that Mr. Wesson had traits consistent with fetal alcohol effect, which can result in language comprehension difficulties, the inability to assess

---

[1] The phrase "intellectual disability" will be used throughout this opinion in place of any references to "mental retardation", as that phrasing is now outdated and no longer employed by the psychological community.

behavior consequences or respond appropriately to subtle social and personal cues, impulsivity, and low frustration tolerance. He also testified that Mr. Wesson's childhood was "very chaotic[.]" It included physical beatings, very little structure or oversight, exposure to many different homes and schools, several head injuries, and severe teasing regarding his stutter. Mr. Wesson also began drinking at an early age and continued to do so throughout his life.

{¶22} Dr. Smalldon testified that he administered the Wechsler Adult Intelligence Scale, Third Edition ("WAIS-3") to Mr. Wesson. He testified that Mr. Wesson had a full-scale IQ of 76. Nevertheless, he never testified about the SEM for the test. Nor did he testify about its publication date or the Flynn Effect.

{¶23} Dr. Smalldon also administered other tests to Mr. Wesson. The Wide-Range Achievement Test showed that Mr. Wesson functioned at (1) the third-grade level in word recognition, (2) the sixth-grade level in spelling, and (3) the second-grade level in arithmetic. The Trail Making Test was divided into two parts. Part A of the test considered visual scanning and psychomotor speed. Dr. Smalldon testified that Mr. Wesson did well on that portion of the test and "scored within the expected range." Part B of the test focused on "cognitive flexibility or the ability to switch back and forth between two competing mental sets in the completion of the same task." According to Dr. Smalldon, Mr. Wesson "faltered badly" on that aspect of the test and "was much, much slower than one would ordinarily expect in a non-brain impaired subject." Additionally, on the Aphasia Screening Test, Mr. Wesson "demonstrated any number of deficits," including difficulty accurately copying figures, articulation mistakes, left/right confusion, and "deficits in his ability to spell even relatively simple words correctly."

{¶24} Dr. Smalldon testified that he diagnosed Mr. Wesson with borderline intellectual functioning, alcohol dependence, a depressive disorder, and a personality disorder not otherwise

specified with passive aggressive, narcissistic, and anti-social features. He never diagnosed Mr. Wesson as being intellectually disabled. It was his opinion that Mr. Wesson would not be entitled to an automatic exemption from the death penalty due to intellectual disability.

{¶25} When Mr. Wesson filed his second petition for post-conviction relief in 2015, Dr. Smalldon submitted an affidavit. The parties also included his affidavit as part of their joint exhibits in 2022. In his affidavit, Dr. Smalldon wrote that he did not believe he should have offered an opinion on whether Mr. Wesson should have been exempt from the death penalty. He admitted that he never specialized in intellectual disability and that he should have advised defense counsel to consult with an expert in that area. Regarding Mr. Wesson's IQ test, Dr. Smalldon admitted that he did not apply the Flynn Effect which would have "raised as a serious issue the possibility that Mr. Wesson's IQ, coupled with documented deficits in adaptive functioning, would have . . . exempted him from the death penalty . . . ." Regarding adaptive functioning, Dr. Smalldon admitted that he had relied too heavily on background information assembled by the mitigation specialist and did not have all the information he needed to conduct a thorough review. He averred that, "[h]ad the defense acquired the expertise of someone like Dr. [Stephen] Greenspan, I might very well have arrived at a different conclusion on the [intellectual disability] issue than the one I stated when I appeared as an expert witness . . . ."[2]

{¶26} The parties deposed Dr. Smalldon in 2022 and submitted his deposition to the trial court as an exhibit in lieu of having him testify in person. During his deposition, Dr. Smalldon stated that, back in 2008, he believed Mr. Wesson's score of 76 on the WAIS-3 disqualified him from an intellectual disability diagnosis, regardless of deficits in adaptive functioning. He readily

---

[2] Dr. Greenspan submitted evidence on behalf of Mr. Wesson in 2015 and testified at the 2022 evidentiary hearing. *See* Discussion, *infra*.

admitted that he was not an expert in intellectual disability and that, over the years, "it became increasingly clear to [him] what a complicated, nuanced, specialized area intellectual disabilities was." Dr. Smalldon testified that he was unable to recall any instances between 2008 and 2015 where he evaluated an individual and found the individual intellectually disabled. He stated: "As I testified before, that's something I never really felt comfortable doing because it wasn't my area of expertise, but I can't say for certain . . . that I never offered an opinion on it. If I did, I don't think I should have."

### Dr. Daniel Grant

{¶27} Dr. Grant, a board-certified neuropsychologist, testified for the defense as an expert in intellectual disability. He assessed Mr. Wesson in 2015, drafted a report, and provided a supplement to his report for the hearing that occurred in 2022. Dr. Grant estimated that he spent about eighteen hours meeting with Mr. Wesson. In preparation for his report and opinion, he administered several tests to Mr. Wesson. He also reviewed mitigation evidence from Mr. Wesson's trial, academic and conduct transcripts from Mr. Wesson's youth, prior tests administered to Mr. Wesson by others, and affidavits from individuals who knew Mr. Wesson.

{¶28} As detailed below, Dr. Grant applied the Flynn Effect whenever assessing an IQ score Mr. Wesson received on an older IQ test. He explained that Flynn conducted a large study in the 1980s to examine intelligence tests. Before IQ tests are published, Dr. Grant explained, test creators collect norms by administering their test to individuals of various ages, races, social and economic statuses, and nationalities. They then examine the data by census percentage and attempt to eliminate any biases. Dr. Grant testified that testing norms are extremely important because you "have to have a well-represented group that includes the individual's group . . . in order to make a decision to even know what you have." He testified that Flynn's research showed older

tests with aging norms resulted in individuals receiving slightly inflated scores. That inflation translated to about one point for every three years that elapsed between the time the norms were collected and the time the test was administered. Dr. Grant testified that the Flynn Effect is recognized by both the DSM and the AAIDD manuals.

{¶29} Dr. Grant's expert report indicated that, when Mr. Wesson was 14 years old in 1971, he took a group-administered intelligence test known as the Kuhlman-Anderson form L Intelligence Test ("the Kuhlman-Anderson test"). Dr. Grant's report indicated that Mr. Wesson had a "PLR score of 85" on the test. The report did not explain the abbreviation "PLR" or what that score meant. Instead, it indicated that the score did "not appear to be an IQ score."[3] The report cautioned against treating the score as an accurate measure of Mr. Wesson's level of intellectual functioning as the Kuhlman-Anderson was a group-administered test and it was unclear whether it had been scored based on age or grade-level, the latter of which would have resulted in an inflated score. Neither party questioned Dr. Grant about the Kuhlman-Anderson test at the 2022 hearing.

{¶30} Dr. Grant's expert report also indicated that, in 1998, Mr. Wesson took the Revised Beta-II test ("the Beta-II"). His report described the Beta-II as "a group administered nonverbal IQ test." Dr. Grant's report indicated that Mr. Wesson received a score of 87 on the test. Yet, the test was released in 1978, meaning that more than twenty years had elapsed between the time its testing norms were collected and the time Mr. Wesson took it. Dr. Grant's report indicated that the Flynn Effect would result in a seven-point reduction in Mr. Wesson's test score, meaning his

---

[3] We would note that Mr. Wesson's elementary school record from the Cleveland Metropolitan School District recorded a score for the Kuhlmann-Anderson test. Although the test record category had a column for "IQ", the score was instead recorded in a column labeled "PLR". That abbreviation was not defined.

adjusted score would be 80. Much like the Kuhlman-Anderson test, Dr. Grant's report advised against relying on the Beta-II test to assess Mr. Wesson's intellectual functioning because it was a group administered test. His report explained that the AAIDD considers standardized, individually administered assessments to be the best indicator of IQ.

{¶31} Regarding the WAIS-3 test that Dr. Smalldon gave Mr. Wesson in 2008, Dr. Grant's report indicated that the test was published back in 1997 and its norms were collected in 1995. His report quoted the AAIDD-11, which advised that "best practices require recognition of potential Flynn Effect when older editions of an intelligence test (with corresponding older norms) are used in the assessment or interpretation of an IQ score." His report indicated that the Flynn Effect would result in a four-point reduction in Mr. Wesson's score on the WAIS-3, giving him an adjusted score of 72 before considering any confidence interval for the SEM.

{¶32} Dr. Grant testified that he assessed Mr. Wesson's IQ in 2015 using the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-4"), the verbal section of the Reynolds Intellectual Assessment System ("RIAS"), and the Leiter International Performance Scale, Third Edition ("Leiter-3"). The WAIS-4 produced a full-scale IQ score of 76 and, adjusting for the SEM, a confidence interval range of 72-81. Dr. Grant testified that he applied the Flynn Effect to Mr. Wesson's score because the norms for the WAIS-4 were collected in 2006 and the test was published in 2008. Because Mr. Wesson did not take the test until 2015, Dr. Grant subtracted three points from his scores to account for the Flynn Effect. Thus, he testified that the WAIS-4 resulted in an adjusted full-scale score of 73 and an adjusted confidence interval range of 69-78.

{¶33} Dr. Grant testified that the RIAS resulted in a verbal intelligence index score of 76. His report indicated that the test was published in 2003. His report further indicated that the test publishers had since released a revised edition noting that test scores from the earlier edition were

inflated by three points due to aging norms. Accordingly, Dr. Grant also applied the Flynn Effect when analyzing Mr. Wesson's score on the RIAS. His report indicated that the RIAS resulted in an adjusted verbal intelligence index score of 72 and an adjusted confidence interval range of 68-77.[4] Dr. Grant testified that Mr. Wesson's adjusted performance scores on the WAIS-3, WAIS-4, and RIAS were all "within one point of each other" and "within one standard error of measurement of an IQ score of 70." He testified that the consistency in that scoring showed the "validity of [the] scores and accuracy of the testing . . . ." It was his expert opinion that Mr. Wesson had an intellectual-functioning deficit.

{¶34} To help him examine Mr. Wesson's adaptive functioning, Dr. Grant had Mr. Wesson take the Texas Functional Living Scale test ("the Texas Functional"). He testified that the Texas Functional is ideal for examining adaptive functioning because (1) unlike other adaptive tests, it relies on first-person testing and accounts rather than asking a third-party to rate a test-taker's abilities, and (2) it shares testing norms with the WAIS, meaning the standard scores from both tests can be directly compared. Dr. Grant explained that the Texas Functional measures all three domains of adaptive functioning (i.e., conceptual, social, and practical). He testified that a score of 100 would be considered an average score and Mr. Wesson scored a 67. His report indicated that the score showed Mr. Wesson had "significant limitations in his adaptive behavior skills."

{¶35} Dr. Grant also reviewed Mr. Wesson's academic records, all of which the parties introduced as exhibits. School transcripts showed that, from fifth to eighth grade, Mr. Wesson

---

[4] Dr. Grant's report appears to contain a mathematical error in this regard. The report specifically indicates that Mr. Wesson's score of 76 should be decreased by three points, but the report then concludes that the adjusted score would be 72 (i.e., a four-point decrease). Notably, a three-point decrease would result in an identical, adjusted scores and adjusted confidence interval ranges on the WAIS-4 and the RIAS.

received virtually all Ds and Fs. He was socially promoted from fifth to seventh grade due to his age and left school before completing the eighth grade. Although transcripts showed Mr. Wesson receiving an A and several Bs for a portion of eighth grade, Dr. Grant testified that those grades appeared to be based on Mr. Wesson having been given individualized materials rather than grade-appropriate materials. He testified that Mr. Wesson took the Gates-McGinite test at the age of 16 to assess his vocabulary and reading comprehension levels. Mr. Wesson's score on the vocabulary portion of the test indicated that he tested at a third-grade level. His score on the reading comprehension portion of the test indicated that he tested at a second-grade level. Dr. Grant testified that Mr. Wesson was never in special education classes because those types of classes did not yet exist at the time he went to grade school.

{¶36} Dr. Grant also reviewed records the Adult Parole Authority created regarding Mr. Wesson. The records showed that, beginning in 1977, Mr. Wesson was arrested five times for various crimes over the span of a year and eventually imprisoned. When placed on parole, he initially failed to report and only did so after his sister found his appointment card and arranged for him to see his parole officer. The records described Mr. Wesson as suffering from "immaturity, impulsiveness, and irresponsibility." A parole officer who met with Mr. Wesson in 1979 wrote that he believed Mr. Wesson's criminal behavior "was due to poor education, broken home, lack of employable skills[,] and being manipulated through peer pressures." Dr. Grant indicated that the behaviors and factors described in the Adult Parole Authority records were consistent with behaviors and factors common to intellectually disabled individuals.

{¶37} It was Dr. Grant's opinion that Mr. Wesson had significant adaptive deficits in the conceptual domain. He testified that a correlation exists between a low IQ and adaptive deficits, but an intellectual disability diagnosis does not depend on proof of a causal link between IQ and

adaptive deficits (i.e., proof that a deficit was caused by one's low IQ rather than something else). Dr. Grant acknowledged that his 2015 report employed language from the DSM-5, indicating that deficits in adaptive functioning had to be "directly related" to one's low IQ score to meet the diagnostic criteria for intellectual disability. He testified, however, that the APA had since issued a text revision to the DSM-5 ("DSM-5TR"). The DSM-5TR deleted the "directly related" language. The DSM-5TR also explained that the change had been made because the deleted language "appear[ed] to [have] inadvertently change[d] the diagnostic criteria for Intellectual Disability to add a fourth criterion[,]" (i.e., a causal relationship between the IQ prong and the adaptive skills prong). Dr. Grant testified that it was not necessary to know the cause of someone's intellectual disability to be able to diagnose it.

{¶38} Dr. Grant opined within a reasonable degree of psychological certainty that Mr. Wesson was intellectually disabled and that his deficits onset when he was still a minor. As to the latter point, he relied on Mr. Wesson's school records, the grade-level testing results he received at the age of 16, and background information he received from Mr. Wesson and his family members.

Dr. Stephen Greenspan

{¶39} Dr. Greenspan, a psychologist and expert in intellectual disability, submitted reports for Mr. Wesson in 2015 and 2022. He also testified at the 2022 evidentiary hearing. Dr. Greenspan published extensively in the field of intellectual disability and was the most cited author in the developmental disability sections of both the DSM-5 and the AAIDD-11. He founded the current three-part model for adaptive behavior (conceptual, practical, and social), which was adopted by the APA and AAIDD. Further, he acted as an advisor to the committee that assembled the DSM-5 and DSM-5TR.

**{¶40}** Dr. Greenspan testified that intellectual disability can be diagnosed without knowing its cause, but its number one known cause in the United States is fetal alcohol spectrum disorder. He testified that most people with an intellectual disability have co-occurring conditions, so other mental health issues and/or personality disorders do not rule out a diagnosis of intellectual disability. According to Dr. Greenspan, even mental health practitioners frequently have misconceptions about intellectual disability. For instance, they often view any perceived abilities or accomplishments as proof that an individual does not have an intellectual disability. He testified that intellectual disability "is ruled in by deficits, but it's not ruled out by accomplishments." As such, perceived strengths do not overrule deficiencies. Dr. Greenspan also rejected the notion that intellectually disabled people always must be surrounded by professionals or receive specialized services. He explained that it is often impossible to know all the facts at a micro-level. As such, an intellectually disabled individual might be receiving help from others outside of any formal or reported setting. He described intellectual disability as a thinking disorder rather than a learning disorder. He offered as an example that an intellectually disabled person might be taught to purchase a bus ticket, learn a route, and ride to a designated location but might falter if the bus broke down and the person had to think of a new way to arrive at their location.

**{¶41}** Dr. Greenspan interviewed Mr. Wesson in 2015. Although he did not personally administer any tests to Mr. Wesson, he reviewed all prior test results. He also reviewed Dr. Grant's reports, the report completed by the State's expert, and all the information and records submitted to those experts. Dr. Greenspan agreed with Dr. Grant's conclusion that Mr. Wesson was intellectually disabled.

**{¶42}** Dr. Greenspan testified that Mr. Wesson's adjusted scores on the WAIS-III, RIAS, and WAIS-IV, in conjunction with the results of the Gates-McGinite test he took at age 16 and the

Wide-Range Achievement Test he took in 2008, evidenced an intellectual-functioning deficit. Dr. Greenspan's report described individually administered IQ tests as the "gold standard" in assessing intellectual deficit. He testified that it was not appropriate to rely on group tests. He also testified, absent any objection from the State, that the State's expert (Dr. Sara West) agreed Mr. Wesson had an intellectual-functioning deficit.

{¶43} As to Mr. Wesson's adaptive functioning, Dr. Greenspan opined that his score on the Texas Functional and "a substantial amount of documentary and descriptive information" indicated he had significant impairments in at least two domains (conceptual and practical) if not all three. He noted that Mr. Wesson had never lived independently and had always relied on women to help him cope. He noted that Mr. Wesson performed very poorly in school, never held a long-term job, and never obtained a driver's license. He also noted that each of the family members who submitted affidavits on behalf of Mr. Wesson described him as an adolescent as being slow, unable to grasp complex rules, and lacking in peer friendships.

{¶44} As to age of onset, it was Dr. Greenspan's professional opinion that the onset of Mr. Wesson's deficits occurred during his developmental period. He cited Mr. Wesson's delays in achieving developmental milestones, his poor school functioning, and the examples provided by Mr. Wesson's family members. He also noted that Mr. Wesson had many significant early risk indicators for intellectual disability including signs of fetal alcohol spectrum disorder, head injuries, and extreme environmental abuse and neglect.

Dr. Sara West

{¶45} Dr. West, a board-certified forensic psychiatrist, submitted a report on behalf of the State in 2022 and testified as its expert at the 2022 evidentiary hearing. Dr. West testified that she interviewed Mr. Wesson for 2.25 hours. She did not administer any IQ tests to him, but she

reviewed the results of his prior tests. She also had him take the Montreal Cognitive Assessment ("the Montreal Cognitive"). Her report described the Montreal Cognitive as a brief, 30-point screening test that assesses cognition. According to her report, "a score of 26 or higher is considered normal[,]" and Mr. Wesson scored a 21.

{¶46} Dr. West acknowledged that Mr. Wesson had deficits in intellectual functioning. In her report, she wrote that he "demonstrate[d] some deficits in intellectual functioning as indicated by his poor school performance, his IQ testing, and impaired performance on the [Montreal Cognitive] . . . ." She also testified to that effect. She explained that she did not take issue with Dr. Grant's and Dr. Greenspan's conclusion that Mr. Wesson suffered from intellectual deficits. The reason she disagreed with their intellectual disability diagnosis was that she did not believe Mr. Wesson's intellectual deficits "caused adaptive functioning deficits." She testified that, to diagnose intellectual disability, an adaptive functioning deficit "has to be attributable to cognitive impairment." Dr. West relied on the DSM-5 to render her diagnosis. She admitted that the APA had since released the DSM-5TR, which eliminated language suggesting a causal link between intellectual deficits and adaptive functioning deficits had to be established (i.e., that deficits in adaptive functioning had to be "directly related to the intellectual impairments"). Nevertheless, it was her opinion that the text revision did not change the diagnostic criteria for intellectual disability. She also testified that she was aware the AAIDD existed but had not read its publications.

{¶47} Dr. West diagnosed Mr. Wesson with severe alcohol use disorder and antisocial personality disorder. She did not believe he had significant deficits in adaptive functioning. To the extent others believed he had significant deficits and thought they were attributable to a lack of adaptive functioning, however, Dr. Wesson found the alleged deficits to be "likely better

accounted for by other factors" such as alcohol addiction and personal choices. Regarding the latter, Dr. West thought there was evidence that Mr. Wesson had chosen not to participate in school as a coping strategy to avoid teasing due to his stutter. She also disagreed with the results of the Texas Functional that Dr. Grant administered to assess Mr. Wesson's adaptive functioning. It was her opinion that her clinical evaluation of Mr. Wesson and the collateral data she reviewed were more accurate and showed he did not have significant deficits in adaptive functioning.

{¶48} Dr. West cited two examples from Mr. Wesson's youth in support of her opinion that he demonstrated adequate adaptive functioning. First, she noted that, at the age of 11 or 12, he had taken money, had bought a bus ticket, and had taken the bus to escape an abusive situation at his grandmother's home. Dr. West testified that Mr. Wesson personally relayed this story to her and did not mention that he had been taught to take the bus or had received help from anyone. Second, she cited comments from staff members at Parmadale, a facility where Mr. Wesson had spent a period of his adolescence. Dr. West described Parmadale as "a residential treatment center for troubled youths[.]" Staff members indicated that they believed Mr. Wesson was able to do his work but simply needed to take school more seriously and participate. They also wrote that he "put on a good front in front of adults" because, once he left the facility, other children admitted he had bullied them. Dr. West believed Mr. Wesson's ability to generate a solution to escape the abuse at his grandmother's home and his ability to fool staff members at Parmadale demonstrated a level of adaptive functioning. The remainder of the examples she cited in support of his adequate adaptive functioning came from the time when he was an adult. She noted that there was evidence he had successfully completed a written form, had participated in romantic relationships, had willingly pursued relationship counseling with one of those women, and had succeeded in appearing well-groomed and well-dressed for a job search despite being homeless at the time.

Sharon C. ("Cousin One")

**{¶49}** Cousin One submitted an affidavit on behalf of Mr. Wesson. Cousin One indicated that she was Mr. Wesson's second cousin through his mother. She averred that Mr. Wesson came to live with her for about a year when he was about five or six years old. According to Cousin One, Mr. Wesson "was slower than he should have been for his age" and she "had to help [him] more than [she] should have had to with his school work."

Herman W. ("Cousin Two")

**{¶50}** Cousin Two submitted an affidavit and testified on behalf of Mr. Wesson at the 2022 evidentiary hearing. He indicated that he was Mr. Wesson's first cousin, was almost six years older than him, and spent large amounts of time with him and his (Mr. Wesson's) siblings when they were children. Cousin Two averred that it was challenging to communicate with Mr. Wesson in their youth because he had a stutter. Moreover, even apart from the stutter, Cousin Two agreed that Mr. Wesson appeared to have more limitations than his siblings. For example, he indicated that their grandmother would sometimes send the children to the store with a list of items to purchase. When she did so, she would always give the list and money to Cousin Two or his brother. According to Cousin Two, "[i]t was never even considered to give that responsibility to [Mr. Wesson] because it was known he had difficulty reading, communicating, and could not handle the money transactions."

Stephen W. ("Cousin Three")

**{¶51}** Cousin Three submitted an affidavit and testified on behalf of Mr. Wesson at the 2022 evidentiary hearing. Cousin Three was Cousin Two's younger brother, so he too spent time with Mr. Wesson and his siblings when they were children. He indicated that he was about seven months older than Mr. Wesson. He testified that Mr. Wesson had "a really intense stuttering

problem" that caused communication difficulties.  Additionally, he would never play board games with Mr. Wesson because Mr. Wesson "was not very smart, besides just his stuttering problem." He averred that, whenever his grandmother sent him and Mr. Wesson to the store without Cousin Two, she would give the list and money to him rather than Mr. Wesson.  He averred that she never gave those items to Mr. Wesson because "he was not able to communicate well enough with the store clerk or know if there was correct change returned."

{¶52}  Cousin Three testified that Mr. Wesson and his siblings all seemed to have "some level of limited capacity as it related to things like judgment" but Mr. Wesson's younger brother eventually "eclipsed [Mr. Wesson] in terms of communication, skills, and the ability to interact with other people."  He averred that Mr. Wesson "was not like the rest" of the children in the family and never performed "any multilayered tasks" as a child.  Indeed, Cousin Three testified that everyone in the family knew Mr. Wesson "wasn't really right" and "didn't trust that he could make decisions at a certain higher level of complexity."  He recalled a particular occasion where he fully realized that Mr. Wesson had poor judgment.  He described how, when he and Mr. Wesson were about nine or ten years old, they saw a group of older boys building a tree house as they were walking down the street.  For no apparent reason, Mr. Wesson picked up a few rocks and began throwing them at the boys.  When the older boys chased them, Cousin Three and Mr. Wesson were able to run away.  Cousin Three indicated that the older boys clearly could have beaten them in a fight, so he asked Mr. Wesson why he had thrown the rocks.  He indicated that he got no response from Mr. Wesson, who appeared to have no explanation for his impulsive behavior.

Randall W. ("Cousin Four")

{¶53}  Cousin Four submitted an affidavit and testified on behalf of Mr. Wesson at the 2022 evidentiary hearing.  He testified that he and Mr. Wesson were about three to four years apart

and spent time together between the ages of about eight and sixteen. Cousin Four testified that Mr. Wesson had a younger brother but always seemed like the youngest child. He specified that Mr. Wesson's younger brother could communicate better, learned skills like cooking, and held down jobs. Meanwhile, Cousin Four thought Mr. Wesson "was slow." He averred that he had never known Mr. Wesson to work and had never seen him count money. He averred that Mr. Wesson never got a license but tried to drive. According to Cousin Four, Mr. Wesson would not read the street signs but "would memorize directions instead, such as 'turn here, go down there.'" He indicated that Mr. Wesson "ended up tearing up a couple of cars by trying to drive [that] way." It was Cousin Four's testimony that he had never known Mr. Wesson to live alone. Instead, he had always lived with someone else, usually a female.

### The Trial Court's Findings & Analysis

{¶54} The trial court determined that Mr. Wesson failed to meet his burden on each of the three core elements of intellectual disability defined in *State v. Ford*. *See Ford*, 2019-Ohio-4539, ¶ 100. We outline the court's findings and analysis regarding each of those core elements in turn.

<u>1. Intellectual Functioning Deficits</u>

{¶55} The trial court found that Mr. Wesson took six IQ tests over the years. It summarized his results in a chart, the contents of which we reproduce herein:

| Year | Test | Score | Flynn Effect Reduction | Flynn Adjusted Score |
|------|------|-------|------------------------|----------------------|
| 1971 | Kuhlman-Anderson | 85 | | |
| 1998 | Beta-II | 87 | 7 | 80 |
| 2008 | WAIS-3 | 76 | 4 | 72 |
| 2015 | WAIS-4 | 76 | 3 | 73 |
| 2015 | RIAS | 76 | 3 | 73 |
| 2015 | Leiter-3 | 81 | 0 | 81 |

The trial court did not include adjusted scores for the SEM in its chart but wrote that it was "aware that the SEM would reduce each of the respective scores by 5 points." As further detailed below, the court focused on Mr. Wesson's scores on the Kuhlman-Anderson test and the Beta-II test. It found that his scores did not meet Ohio's standard for an intellectual functioning deficit. Additionally, it found that the State never conceded the Flynn Effect should apply and that application of the Flynn Effect was unwarranted.

{¶56}   The trial court acknowledged that, in her report, Dr. West (the State's expert), found that Mr. Wesson "demonstrated some deficits in intellectual functioning as indicated by his poor school performance, his IQ testing and impaired performance on the [Montreal Cognitive]." Even so, the court found that Dr. West never testified which IQ tests she relied upon or whether she would have applied the Flynn Effect. Thus, it concluded that the State never conceded that Mr. Wesson suffered from an intellectual functioning deficit or that the Flynn Effect should apply to his test scores.

{¶57}   The trial court placed the greatest weight on Mr. Wesson's scores on the Kuhlman-Anderson test and the Beta-II test, both of which had been administered before Mr. Wesson turned eighteen. The court wrote that it "[found] the specific testimony of [Dr.] Greenspan persuasive when he stated that he was not concerned about any acts that occurred prior to [Mr. Wesson's] developmental date."[5]   Although the Kuhlman-Anderson test was a group-administered test, the court was not convinced by Dr. Grant's testimony that the test score should be disregarded for that reason. It wrote that "the DSM states that an invalid score may result and does not mandate the

---

[5] The quoted language has been reproduced verbatim. It appears the trial court misstated Dr. Greenspan's testimony in this regard, as the court's analysis only focused on acts and tests that occurred before Mr. Wesson turned 18. *See* Discussion, *infra*.

test's exclusion." The court found that Mr. Wesson's score on the Beta-II test evidenced the validity of the Kuhlman-Anderson test score he received.

{¶58} Finally, the court found that it would not apply the Flynn Effect because neither of Mr. Wesson's experts "testified specifically why the Flynn [E]ffect was required on the requested tests." The court noted that Dr. Smalldon, Mr. Wesson's expert during the mitigation phase of his trial, never applied the Flynn Effect. It further noted that application of the Flynn Effect was not mandatory under the DSM, the AAIDD's manual, or the law. For the foregoing reasons, it found that Mr. Wesson had not proven an intellectual functioning deficit by a preponderance of the evidence.

2. Significant Adaptive Deficits

{¶59} The trial court found that Mr. Wesson failed to prove he had significant adaptive deficits in any of the three domains, aka, skill sets. It noted that the DSM "states that a person must be 'sufficiently impaired that ongoing support is needed in order for the person to perform adequately across multiple environments, such as home, school, work and community.[']" The court found that Mr. Wesson had never received any educational or occupational services to address any adaptive deficit. Moreover, the court noted, there was evidence that he "held multiple jobs, and had average grades in most classes." The court refused to consider any adaptive tests that Dr. Grant administered to Mr. Wesson, including the Texas Functional. As support for that decision, the court wrote that it heard testimony from Dr. Greenspan "that he only relies upon events that occurred prior to the age of 18 when diagnosing [intellectual disability]."

{¶60} The trial court found that certain factors explained Mr. Wesson's alleged struggles but did not establish an intellectual disability. The court wrote that stuttering is not an indicator of intellectual disability, but Mr. Wesson's stutter led people "to *assume* he was slow . . . ."

(Emphasis in original.). It found evidence that Mr. Wesson could handle money, as there was evidence that he stole money and used it to take a bus to escape from his grandmother's home as a child. It further found that "accounts of perceived impulsive behavior do not prove an adaptive deficit." The court offered, as an example, that Mr. Wesson's attempt to fight older boys by throwing rocks at them "may have been a logical choice." It noted that he had a difficult childhood. The court wrote: "[t]he evidence is clear that he turned to alcohol at a young age and that his alcohol use disorder was the main cause of the problems he experienced once he started drinking." For the foregoing reasons, the court found that Mr. Wesson had not proven by a preponderance of the evidence that he suffered from significant adaptive deficits.

### 3. Onset of Deficits

{¶61} As to the onset element, the court only wrote: "Based upon the aforementioned analysis, the Court finds [Mr. Wesson] has not proven by a preponderance of the evidence that the onset of any alleged deficits occurred while [he] was a minor."

**Mr. Wesson's Arguments on Appeal & The State's Response**

{¶62} Mr. Wesson argues that the trial court's decision was unconstitutional and failed to adhere to established precedent in several respects. First, he argues the court erred when it rejected the views of experts, conducted its own assessment of his IQ scores, refused to consider the Flynn Effect without adequate justification, and employed a strict cutoff of 70 points when interpreting his scores. He notes that the court failed to offer any valid rationale for rejecting the uniform conclusion of the three experts who testified, all of whom agreed he had intellectual functioning deficits. According to Mr. Wesson, the court failed to adhere to established precedent cautioning against strict cutoffs in the context of IQ scores.

{¶63} Second, Mr. Wesson argues the trial court erred by disregarding the results of any tests performed on him after the age of eighteen. The court refused to consider the results of tests relevant to both his intellectual functioning and adaptive functioning because they were administered past the age of majority. Mr. Wesson argues that, in capital cases involving *Atkins* claims, the United States Supreme Court and the Ohio Supreme Court have routinely considered the results of tests performed past the age of majority. Moreover, Mr. Wesson argues that the trial court offered internally inconsistent reasoning in support of its decision. While the court found Dr. Greenspan to be a persuasive witness, it simultaneously refused to consider test results he relied upon in forming his expert opinion.

{¶64} The State urges this Court to reject Mr. Wesson's arguments for the following reasons. As to his strict cutoff argument, the State notes that the trial court's decision accurately summarized the controlling legal standards at its outset. The decision also referenced the SEM when summarizing Mr. Wesson's test scores. The State notes that the trial court did not reject Mr. Wesson's claim strictly because of his IQ scores. Instead, it went on to address the other two elements of intellectual disability. The State argues that the court's findings show it did not reject Mr. Wesson's intellectual disability claim due to a strict IQ cutoff.

{¶65} As to the trial court's refusal to consider the results of tests Mr. Wesson took after age 18, the State argues that Mr. Wesson's own expert invited the court to limit its review in that manner and "to shy away from using number-based assessments . . . when deciding whether [he] suffered from intellectual disability." The State notes that Dr. Greenspan specifically testified that, "[w]hen we're diagnosing [intellectual disability], we only talk about how they were before the age of 18 or 22[.]" He also described intellectual disability as a condition rather than number.

Thus, the State argues the trial court did not err by exercising its discretion and refusing to give evidentiary weight to any tests Mr. Wesson took as an adult.

{¶66} Lastly, the State argues that Mr. Wesson was not prejudiced by any errors the trial court made in refusing to consider certain evidence because it still analyzed each element of intellectual disability and simply agreed with the opinion rendered by the State's expert. The State notes that Dr. West found Mr. Wesson had adequate adaptive functioning and offered several examples to support her opinion. The State argues that any errors in the court's analysis of Mr. Wesson's test scores were harmless because other evidence in the record supports its decision.

**This Court's Analysis**

{¶67} Upon review, we agree the trial court misapplied the law in several respects when analyzing Mr. Wesson's claim of intellectual disability. Those errors affected its entire analysis, as they led it to categorically disregard certain evidence and to rely upon much of the same type of flawed rationale the United States Supreme Court cautioned against in *Hall*, *Moore I*, and *Moore II*. *See Hall*, 572 U.S. 701 (2014); *Moore I*, 581 U.S. 1 (2017); *Moore II*, 586 U.S. 133 (2019). For the following reasons, we find it appropriate to remand this matter to the trial court for it to conduct the proper analysis in the first instance, guided by the following discussion. *See Ford*, 2019-Ohio-4539, at ¶ 98-100.

1. Intellectual Functioning Deficits

{¶68} The trial court found that Mr. Wesson took six IQ tests. Although the court referenced each of those scores, it is not entirely clear how it applied them. The court wrote that Mr. Wesson's scores on the WAIS-3, WAIS-4, and RIAS "[did] not meet the standard set in the state of Ohio." It also wrote that it "[found] the specific testimony of [Dr.] Greenspan persuasive when he stated that he was not concerned about any acts that occurred prior to [Mr. Wesson's]

developmental date." That quotation was followed by the court's consideration of only the Kuhlman-Anderson test and the Beta-2 test. Mr. Wesson took both of those tests before turning 18. The trial court determined that his scores on those tests were valid. It then concluded that Mr. Wesson had not met his burden of establishing an intellectual functioning deficit. It follows from the foregoing analysis that the trial court misstated Dr. Greenspan's testimony and meant to say he *was only* concerned with acts occurring prior to Mr. Wesson's developmental date. It also follows that the trial court limited its analysis based on that understanding of Dr. Greenspan's testimony, relied on the test scores Mr. Wesson received before turning 18, and concluded that those scores did not justify a finding of intellectual disability.

{¶69} The trial court did not provide a citation for the specific testimony of Dr. Greenspan on which it relied. The State suggests the court may have been referring to a portion of Dr. Greenspan's testimony wherein he stated: "When we're diagnosing [intellectual disability], we only talk about how they were before the age of 18 or 22." In that portion of his testimony, however, Dr. Greenspan was not discussing any of Mr. Wesson's test scores. He was responding to questions about a letter Mr. Wesson allegedly wrote from prison as an adult. He indicated that Mr. Wesson could have "grown somewhat over the years" in terms of having a slightly higher reading level than he had managed as a child. Nevertheless, he explained, an intellectual disability diagnosis would be based on abilities an individual had before the age of majority. Dr. Greenspan *never* testified that standardized tests administered to an individual past the age of 18 are irrelevant to an intellectual disability diagnosis. Indeed, he *agreed* with the results of the tests Dr. Smalldon and Dr. Grant performed when Mr. Wesson was an adult. He relied on them in forming his expert opinion, as did the other experts who testified. Additionally, both the United States Supreme Court and the Ohio Supreme Court have routinely considered the results of IQ tests administered past

the age of majority in *Atkins* cases. *See Hall*, 572 U.S. at 707, 724 (reversing unconstitutional application of strict 70-point threshold where defendant took nine IQ tests over 40 years); *Moore I*, 581 U.S. at 10, 13 (finding lower court erred in discounting certain IQ test scores taken 15 years apart); *Ford*, 2019-Ohio-4539, ¶ 63, ¶ 88 (including in analysis and review the IQ test the defendant took at age 19). *See also State v. White*, 2008-Ohio-1623, at ¶ 23, ¶ 29.

{¶70} Notably, none of the experts who testified relied on the results of the Kuhlman-Anderson test Mr. Wesson took in 1971. The evidence showed that test was a group-administered test rather than an individualized assessment. Moreover, the test only resulted in a "PLR score of 85[.]" There was no evidence that PLR scores and IQ scores are interchangeable. Dr. Grant specifically testified that the score did not appear to be an IQ score. In fact, Mr. Wesson's school records contained separate columns for "PLR" scores and "IQ" scores. Those records showed his score on the Kuhlman-Anderson test was not recorded as an IQ score. It appears the trial court gave that test score significant weight despite it not being indicative of IQ.

{¶71} Even if Mr. Wesson achieved a higher score on certain tests, that fact would not allow the trial court to ignore lower scores on different tests. *Ford* at ¶ 85. When a defendant has taken multiple IQ tests, "each score must be assessed using the SEM . . . ." *Hall*, 572 U.S. at 714. Because Mr. Wesson took multiple IQ tests, the trial court was required to consider each of his scores, apply the SEM to each of his scores, and determine whether any of them evidenced an intellectual-functioning deficit. As noted, an intellectual functioning deficit is indicated by an IQ score of "*roughly* 70 or lower when adjusted for the [SEM]." (Emphasis added.) *Ford* at ¶ 100. *See also Hall* at 722 ("An IQ score is an approximation, not a final and infallible assessment of intellectual functioning."). There is no dispute that Mr. Wesson received a full-scale IQ score of 76 on three separate IQ tests: the WAIS-3, the WAIS-4, and the RIAS. Those scores did not

account for the SEM. The trial court acknowledged the SEM but did not explicitly apply it to each of Mr. Wesson's scores to produce a specific confidence interval range for each score. There was testimony that, for at least two of Mr. Wesson's tests, the SEM would result in a confidence interval range as low as 72; just two points shy of 70. That adjusted score also did not account for the Flynn Effect. Because Mr. Wesson presented evidence on the Flynn Effect, the trial court was required to consider and discuss that evidence before deciding whether to adjust his scores due to that phenomenon. *See Ford* at ¶ 89-92.

{¶72} The trial court found that Mr. Wesson's experts defined the Flynn Effect, but "neither expert testified specifically why the Flynn [E]ffect was required on the requested tests." The court found that application of the Flynn Effect was not mandated by law, the DSM, or the AAIDD's publications. It also noted that Dr. Smalldon never applied the Flynn Effect. For the foregoing reasons, it refused to apply the Flynn Effect to Mr. Wesson's scores.

{¶73} This Court is troubled by the trial court's discussion of the Flynn Effect for several reasons. To be sure, application of the Flynn Effect is not mandatory and is left to the discretion of the trial court. *Id.* at ¶ 91-92. Before the trial court can exercise its discretion in that regard, however, it must discuss and consider the evidence presented on the Flynn Effect. *Id.* at ¶ 92. Dr. Grant testified in detail about the Flynn Effect. He explained the critical purpose testing norms serve when designing and publishing an IQ test. He explained how aging test norms affect IQ scores, resulting in inflated scores on tests administered years after the norms were collected. He cited language from the AAIDD, indicating that best practices required recognition of the potential Flynn Effect for older editions of intelligence tests with aging norms. He also explained the rate at which scores were found to inflate. Dr. Grant testified as to when the norms were collected for the WAIS-3 and the WAIS-4 as well as the publication dates for those tests and the RIAS. He also

calculated the Flynn Effect for each of those tests and testified as to the adjusted confidence intervals they produced. As to the RIAS, he specifically cited language from the publishers of a revised edition of that test wherein the publishers noted that test scores from the earlier edition were inflated by three points due to aging norms. The trial court did not discuss any of that testimony in analyzing Mr. Wesson's argument. Instead, it found that neither Dr. Grant nor Dr. Greenspan explained why the Flynn Effect should apply. It is not clear to this Court what additional evidence the trial court believed Mr. Wesson should have produced in support of his argument on the Flynn Effect. The trial court did note that Mr. Wesson's mitigation expert, Dr. Smalldon, never applied the Flynn Effect. Yet, at the time of the evidentiary hearing, Dr. Smalldon took the position that he should not have offered *any* opinion on intellectual disability because it was not his area of expertise. He indicated that the Flynn Effect was "now very well-documented in the literature" and, had it been applied, it would have "raised as a serious issue the possibility that Mr. Wesson's IQ, coupled with documented deficits in adaptive functioning, would have . . . exempted him from the death penalty . . . ."

{¶74} Notably, all three experts who testified at the evidentiary hearing agreed Mr. Wesson had deficits in intellectual functioning. *See Hall*, 572 U.S. at 710 ("In determining who qualifies as intellectually disabled, it is proper to consult the medical community's opinions."). Even the State's expert, Dr. West, stated that she did not take issue with Dr. Grant's and Dr. Greenspan's conclusion that Mr. Wesson suffered from intellectual deficits. The trial court did not consider Dr. West's concessions to be binding on the State because she did not testify "which IQ tests she relied upon nor whether she would have applied the Flynn Effect." It is unclear to this Court, however, how any perceived failure on the part of the State's expert to explain the basis for her opinion would be to the detriment of Mr. Wesson.

{¶75} This Court takes no position on the ultimate issue of whether Mr. Wesson proved an intellectual functioning deficit. It is our decision that the trial court misapplied the law, and thus, failed to conduct a proper analysis in reviewing Mr. Wesson's argument. We cannot conduct that analysis in the first instance. *See Greer v. Finest Auto Wholesale, Inc.*, 2020-Ohio-3951, ¶ 41 (9th Dist.). As such, we must remand this matter to the trial court for it to conduct a proper review.

2. Significant Adaptive Deficits

{¶76} Because the trial court also rejected Mr. Wesson's intellectual disability claim based on his failure to prove significant adaptive deficits, we would be remiss if we did not address that portion of its analysis as an independent ground for its decision. The trial court refused to consider the results of any adaptive tests performed by Dr. Grant when Mr. Wesson was an adult. As previously explained, the court reached that decision based on a mischaracterization of Dr. Greenspan's testimony. Dr. Greenspan specifically cited Mr. Wesson's performance on the Texas Functional in his expert report and found that his score showed "very substantial adaptive impairment." The trial court never indicated that it found Dr. Greenspan unreliable. Indeed, it wrote that it found aspects of his testimony persuasive. It was Dr. Greenspan's opinion that Dr. Grant was justified in his findings and diagnosis. Other than the trial court's mischaracterization of Dr. Greenspan's testimony, there does not appear to be any rationale for its refusal to consider Mr. Wesson's test results. The fact that he took those tests as an adult, standing alone, was not a valid basis for refusing to consider them. *See White*, 2008-Ohio-1623, at ¶ 84-85 (finding the trial court erred by refusing to consider results of adaptive skills testing where defendant was never tested before the age of 18).

{¶77} Apart from its erroneous refusal to consider Mr. Wesson's test results, the record reflects the trial court employed many of the same analytical errors the United States Supreme

Court cautioned against in *Moore I* and *Moore II*. First, the court "overemphasized [Mr. Wesson's] perceived adaptive strengths" rather than focusing on his adaptive deficits. *Moore I*, 581 U.S. at 15; *Moore II*, 586 U.S. at 136. The court found that Mr. Wesson never received any educational or occupational services, "held multiple jobs, and had average grades in most classes." Further, it found he could handle money because he once managed to take a bus to Cleveland on his own as a child. It appears the court only focused on a small segment of Mr. Wesson's academic records. The records showed that he received Ds and Fs in most of his classes for several years and was socially promoted to seventh grade due to his age. To the extent he received better grades during one quarter of eighth grade, there was evidence that he received individual coursework at that time rather than grade-level materials. Moreover, it does not appear that the court considered the results of the Gates-McGinite test Mr. Wesson took at age 16. That test showed he understood vocabulary at a third-grade level and read at a second-grade level. Although Mr. Wesson never received educational services, the evidence showed that special education programs did not exist yet at the time he went to grade school. Several members of his family said they had to help him more than they should have with schoolwork and other tasks. They also said that he could not reliably count money, had never held a long-term job, and had always lived with someone. In analyzing Mr. Wesson's argument, it was error for the trial court to "'overemphasize[] [his] perceived adaptive strengths'" rather than focusing on his adaptive deficits. *Moore II* at 136, quoting *Moore I* at 15.

{¶78} Second, the trial court appears to have readily attributed any perceived adaptive deficits Mr. Wesson had to traumatic experiences or co-existing conditions rather than intellectual disability. *See Moore I* at 16; *Moore II* at 136. The court suggested that Mr. Wesson's stutter may have caused others to *assume* he was slow as a child. It also noted that Mr. Wesson was abused and neglected as a child and drank alcohol from an early age. The trial court found that "his alcohol

use disorder was the main cause of the problems he experienced once he started drinking." Yet "[c]linicians rely on [] factors [such as childhood abuse and suffering] as cause to explore the prospect of intellectual disability further, not to counter the case for a disability determination." *Moore I* at 16. "As mental-health professionals recognize, . . . many intellectually disabled people also have other mental or physical impairments . . . ." *Id.* at 17. Neither Mr. Wesson's stutter, his abusive childhood, nor any alternative diagnoses he received precluded a finding of intellectual disability. It was Mr. Wesson's burden to prove the existence of significant adaptive deficits, not the cause of those deficits. *See Ford*, 2019-Ohio-4539, at ¶ 100. The trial court erred by attributing his difficulties solely to other experiences and conditions. *See Moore I* at 16; *Moore II* at 136.

{¶79} Finally, the trial court appears to have relied on certain "lay perceptions of intellectual disability" and "lay stereotypes" when assessing Mr. Wesson's claim. *Moore II* at 137, quoting *Moore I* at 18. The court noted that Mr. Wesson "held multiple jobs" and never received "educational or occupational services to address any adaptive deficit." It did not cite any expert testimony in support of its position that those facts would negate a finding of disability. Meanwhile, Dr. Greenspan testified that many intellectually disabled individuals are not globally impaired and are capable of being in a relationship or having a job. He testified that it is often impossible to know all the facts on a micro-level and that intellectually disabled individuals might be receiving help from others outside of any formal or reported setting. "While the trial court is the trier of fact, it may not disregard credible and uncontradicted expert testimony in favor of either the perceptions of lay witnesses or of the court's own expectations of how [an intellectually disabled] person would behave." *White*, 2008-Ohio-1623, at ¶ 74.

{¶80} This Court takes no position on the ultimate issue of whether Mr. Wesson proved he suffered from significant adaptive deficits in any of the three adaptive skill sets. *See Ford* at ¶ 100. It is our decision that the trial court misapplied the law, and thus, failed to conduct a proper analysis in reviewing Mr. Wesson's argument. We cannot conduct that analysis in the first instance. *See Greer*, 2020-Ohio-3951, at ¶ 41 (9th Dist.). As such, we must remand this matter to the trial court for it to conduct a proper review.

3. Onset of Deficits

{¶81} Finally, the trial court rejected Mr. Wesson's intellectual disability claim based on his failure to prove that his alleged deficits onset during his developmental period. The court cited its "aforementioned analysis" as the sole basis for that conclusion. We have already determined that the trial court failed to conduct a proper analysis. Accordingly, on remand, the trial court must also reexamine the onset of deficits element in the context of its new analysis.

{¶82} For the foregoing reasons, Mr. Wesson's second assignment of error is sustained, and the matter is remanded for further proceedings consistent with the foregoing opinion.

**ASSIGNMENT OF ERROR I**

**THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FOUND THAT [MR.] WESSON DID NOT ESTABLISH BY A PREPONDERANCE OF THE EVIDENCE THAT HE IS INTELLECTUALLY DISABLED.**

{¶83} In his first assignment of error, Mr. Wesson argues the trial court abused its discretion when it found that he failed to prove he was intellectually disabled. Based on our resolution of Mr. Wesson's second assignment of error, his first assignment of error is premature. Thus, we decline to address it.

III.

**{¶84}** Mr. Wesson's second assignment of error is sustained. We decline to address the merits of his first assignment of error, as it is premature. The judgment of the Summit County Court of Common Pleas is reversed, and the cause is remanded for further proceedings consistent with the foregoing opinion.

Judgment reversed,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

BETTY SUTTON
FOR THE COURT

STEVENSON, P. J.
HENSAL, J.
CONCUR.

APPEARANCES:

STEPHEN C. NEWMAN, Federal Public Defender, and JOSEPH E. WILHELM. Assistant Federal Public Defender, for Appellant.

RACHEL TROUTMAN, MICHELLE UMANA, and MELISSA JACKSON, Attorneys at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and C. RICHLEY RALEY, JR., Assistant Prosecuting Attorney, for Appellee.